1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9              EASTERN DISTRICT OF CALIFORNIA
10

11  METROPOLITAN PROPERTY AND              No.  2:16-cv-00352-MCE-DB
    CASUALTY INSURANCE COMPANY,
12
                 Plaintiff,
13                                          **FINDINGS OF FACT AND**
        v.                                  **CONCLUSIONS OF LAW**
14
    SARAH MARIE HEDLUND, et al.,
15
                 Defendants.
16

17          This is a declaratory relief action that involves a policy of automobile liability

18  insurance, Policy No. 40856-3594, issued by METROPOLITAN PROPERTY AND

19  CASUALTY INSURANCE COMPANY ("MET").  MET was and is, at all times pertinent to

20  this action, an insurance company authorized to do business in the state of California.

21  Defendants are DANIEL SAH ("SAH"), a named insured under the subject MET

22  automobile policy, SARAH MARIE HEDLUND ("HEDLUND"), who was insured under the

23  auto policy as a permissive user of SAH at the time of the underlying September 21,

24  2012 motor vehicle accident, (collectively the "insureds") as well as SCOTT

25  MAGNUSON ("MAGNUSON"), who was injured as a result of said accident.  Having

26  presided over a one (1) day bench trial, the Court now concludes that MET failed to

27  properly discharge the duties of good faith and fair dealing it owed its insureds.  The

28  Court bases that conclusion on the manner in which MET handled a letter from

                                        1

1  MAGNUSON (the "Magnuson Letter") demanding disclosure of the policy limits and

2  seeking to effectuate a settlement within those limits.  Because the Court finds that MET

3  acted in bad faith in responding to the Magnuson Letter, it must indemnify its insureds

4  from the resulting non-collusive California State Court stipulated excess judgment

5  against permissive user HEDLUND.[1]

6

7  **JURISDICTION AND VENUE**

8

9  The subject Declaratory Relief Complaint was filed by MET, whose principal place

10  of business is in the State of Rhode Island, against the individual Defendants, who are

11  California residents.  Jurisdiction is premised ion diversity of citizenship pursuant to 28

12  U.S.C. § 1332(a) and plaintiffs allege that the amount in controversy exceeds

13  $75,000.00.  The Court was asked to exercise its discretion and render a declaratory

14  relief judgment determining the rights and liabilities of the parties under a contract  of

15  insurance pursuant to Rule 57 of the Federal Rules of Civil Procedure and title 28 U.S.C.

16  § 2201.  Compl. ¶¶ 2-7; Answer.

17  Venue is proper in the Eastern District of California pursuant to 28 U.S.C.

18  §§ 1391(b)(1) and 1391(b)(2) because Defendants reside in this district and because the

19  events giving rise to the need for declaratory relief also occurred here.  Compl. ¶¶ 6, 7,

20  and 8.

21

22  [1] Because the Court finds MET's conduct in handling the Magnuson Letter in October and November of 2012 sufficient to support its conclusion that MET acted in bad faith, it need not address Defendants' additional contention that MET continued to act in bad faith throughout the underlying state proceedings (by, for example, repeatedly failing to advise it's insureds that MAGNUSON's theory was that MET, as opposed to HEDLUND, was liable for the entirety of MAGNUSON's damages notwithstanding the policy limits).  MET contends that contention is beyond the scope of the Court's Final Pretrial Order.  The Court is not necessarily persuaded by MET's arguments as to the limited scope of the pretrial order since: (1) any additional bad faith arguments could not have been uncovered until MET finally disclosed the entire claim file (subject to limited protections) after this Court held the Final Pretrial Conference; and (2) MET itself stipulated to numerous facts that did not arise until the underlying litigation had already been initiated, which seems to indicate MET agrees that some facts from that time period are relevant.  Because the evidence of additional post-litigation bad faith presented to the Court at trial is not critical to its current decision, however, and because it would only serve to provide additional bases for finding that MET acted in bad faith, the Court will focus here solely on MET's conduct in responding to the Magnuson Letter.

**FINDINGS OF FACT**[2]

1.     MET issued an automobile liability policy bearing policy number 40856-3594 with effective coverage dates of May 1, 2012, through November 1, 2012, to Jane Sur, Michael Sur, and SAH providing third-party liability coverage limits of $250,000 per injury and $500,000 per occurrence.  Stipulation to Undisputed Facts ("SUF") Nos. 5-6.[3] Defendant HEDLUND was a permissive user under the MET auto policy during all times relevant to this action.  Complaint ¶ 4; SUF No. 7.

2.     On September 21, 2012, an automobile collision occurred involving a 2012 Toyota Corolla driven by HEDLUND and a 2002 Hyundai Sonata owned and driven by Renee Elena Lowe.  SUF No. 7.  At the time of the collision, Defendant MAGNUSON was seated and belted in the front passenger seat of the car driven by Lowe.  SUF No. 8.  MAGNUSON was rendered unconscious in the collision and both he and Lowe had to be transported from the scene via ambulance to the nearest trauma center.  SUF Nos. 8 and  9.  Magnuson sustained significant orthopedic injuries and a serious traumatic brain injury that left him unable to return to gainful employment.  Id.

3.     There were two independent witnesses to the collision and both immediately reported to the responding CHP officer that HEDLUND had caused the collision by running a red light for her direction of travel and striking the turning Lowe vehicle broadside on the passenger side where MAGNUSON was seated.  SUF No.10. At the accident scene, HEDLUND told the investigating CHP officer that she did not know what the color the light was for her as she entered the intersection.  SUF No. 11. ///

---

[2] "To the extent that any of the Findings of Facts may be deemed Conclusions of Law, they also shall be considered conclusions.  Likewise, to the extent that any of the Conclusions of Law may be deemed Findings of Fact, they shall be considered findings."  United States v. Newmont USA Ltd. and Dawn Mining Co., No. CV-05-020-JLQ, 2008 WL 4621566 at *2 n.1 (E.D. Wash. Oct. 17, 2008), citing Miller v. Fenton, 474 U.S. 104, 113-14 (1985) (noting the difficulty, at times, of distinguishing findings of facts from conclusions of law).

[3] Where the evidentiary support is based upon stipulated facts, additional citations are not provided.

4.      On September 22, 2012, the day after the accident, MET received its first report of the collision when its claims professional, Sylvia Verdugo, received a call from named insured SAH.  SAH was not in the car at the time of the accident.  SUF No. 12.

5.      On September 25, 2012, HEDLUND called MET, spoke with MET claims professional, Shani Williams, and provided her with a recorded interview with the details of the collision.  HEDLUND confirmed that all drivers and passengers were taken to the trauma center by emergency responders.  SUF No. 13.

6.      On September 26, 2012, MET confirmed that HEDLUND was a "permissive user" of the SAH vehicle.  SUF No. 14.

7.      On October 4, 2012, MET claims adjuster Danielle Schiller ("SCHILLER") indicated in the claim notes (also referred to during trial as "Charlie Notes") that the driver and passenger were identified as Renee Lowe and MAGNUSON, but that contact information for them was still unknown.  SUF No. 15.

8.      On October 3 or 4, 2012, approximately two weeks after the accident, while still hospitalized and after not hearing from anyone from MET, MAGNUSON consulted with legal counsel, attorney Catia Saraiva.  Defs.' Exs., LL at 8:6-9; HH at 32:25-33:8, 36:21-24.  At the time of this consult, MAGNUSON had only the face sheet of the CHP accident report available to him.  Defs. Ex. LL at 13:7-21.

9.      Attorney Saraiva advised MAGNUSON that given what appeared to be HEDLUND's clear liability and his severe injuries (consisting of a traumatic brain injury requiring approximately seven days of intensive care on a respirator, orthopedic fractures of his pelvis and tailbone, and reports of back and shoulder injuries) he would not likely require legal representation to settle his case.  Pl.'s Ex. 32 at 12:15-13:6.  The face sheet of the accident report indicated that the adverse vehicle was not a commercial vehicle.  Attorney Saraiva accordingly advised MAGNUSON that the insurance limits were likely to be small enough that MAGNUSON could settle his claim on his own without paying a legal fee.  Id.

///

4

10.     At the time of the collision, MAGNUSON had recently left his former employment and was scheduled to start a new job the following Monday.  He was receiving health coverage through COBRA.  Defs.' Ex. HH at 28:2-14.  Accordingly, following the collision, MAGNUSON was anxious to learn MET's applicable policy limits because he was very concerned about his ability to return to work and to continue to pay for COBRA coverage and living expenses.  Id. at 28:15-29:7, 29:15-30:7, 35:7-36:8; Defs.' Ex. II at 19:11-24.

11.     To assist MAGNUSON in learning the amount of the third-party liability insurance limits, attorney Saraiva drafted a letter for MAGNUSON to send to MET.  This is the "Magnuson Letter" referenced above.  That letter asked to have the insurance limits information disclosed within 15 days.  SUF Nos. 21, 22.  In that letter, MAGNUSON designated his sister, Cora Odra ("ODRA") as the person MET should contact on MAGNUSON's behalf.  SUF No. 23.  MAGNUSON further advised that he was relying on his sister while recovering from his grave injuries, not the least of which included coping with the residual effects of his brain injury.  Pl.'s Ex.1; SUF No. 23.

12.     With MAGNUSON's consent and authority, ODRA faxed the Magnuson Letter to MET and sent MET a copy by certified mail on October 5, 2012.  Pl.'s Ex. 30 at 39:9-17; SUF No. 22; Pl.'s Ex. 27.  Although the Magnuson Letter was not dated, it is undisputed that it was received by MET on October 5, 2012, the date it was faxed.  SUF No. 21.

13.     That same day, October 5, 2012, Renee Lowe called MET, spoke with MET employee, Friat Eilders, and provided the name, address, and phone number for her passenger, MAGNUSON.  Lowe also advised Friat Eilders that both she and her passenger MAGNUSON were taken to the emergency room by ambulance and that MAGNUSON continued to be hospitalized with a broken pelvis and displaced hip.  SUF No. 16.  It follows that the same day MET received the Magnuson Letter it also received MAGNUSON's contact information from Ms.Lowe and was therefore separately informed that MAGNUSON was still hospitalized.

1    14.    Within the Magnuson Letter, MAGNUSON identified the accident date,

2    policy number and HEDLUND's status as a permissive user under MET's policy.  He

3    also enclosed the face sheet of the traffic collision report, stating as follows:

4
5
6
7
> On September 21, 2012 I was seriously injured in accident caused by Sarah Marie Hedlund who has insurance with Metropolitan Direct.  I'm attaching copy of the cover page of the traffic collision report which lists you as the insurance company, policy number 4085635940.  I was front seat passenger, seatbelt on, in car driven by Renee Elena Lowe.

8    Pl.'s Ex. 1.

9    15.    MAGNUSON also advised MET regarding the injuries he had sustained

10   and explained that he needed to know how much insurance was available:

11
12
13
14
15
16
> I'm writing to find out how much insurance there is, and to find out the amount of medical that your company will reimburse me.  My injuries are serious and I'm told I have broken pelvic bone, traumatic brain injury tail bone fracture, as well as injuries to my back, right shoulder, chest, neck, right hand numbness.  They tell me I was in the ICU, ventilator, for about 7 days at Sutter Roseville Hospital.  I'm still at hospital at Sutter Rehabilitation Center now and am taking lots of medication.  I'm still in a lot of pain and I'm still seeing doctors for my injuries, and brain injury.  They tell me I'm lucky to be alive because we got hit so hard.

17   Id.

18   16.    Critically, MAGNUSON wanted to be provided the policy limits within 15

19   days so he could anticipate the settlement value of his case, acknowledging, of course,

20   that MET would require additional documentation prior to actually paying his claim.  The

21   policy limits information was important to MAGNUSON so he could determine how to

22   meet his immediate financial needs.  He thus advised:

23
24
25
26
> So I want to know within **fifteen days** from now how much insurance there is for this accident so I can anticipate how much I can settle my case for and know how much money I might expect after you get the proof you will need to pay my case.  Knowing how much insurance is available will help me plan for my financial future to include whether or not I have to borrow money or change my living arrangements, etc.

27   Id.

28   ///

17.     MAGNUSON went on to advise, however, that absent timely cooperation from MET, he would not be willing to settle for the policy limits and would instead seek to recover his losses in full from MET's insured, HEDLUND:

> If I don't receive cooperation from you and Ms. Hedlund, as I ask for now, I won't put this behind me for the available insurance and will ask to have all my bills and other losses paid in full by the one that caused the accident, Ms. Hedlund.

Id.

18.     MAGNUSON then asked MET to respond to ODRA and to let her know what, if any, additional information was needed and how long the claims process could be expected to take:

> If you need me to get you anything else for you please tell me.  Also, how long do you think claim process will take.
>
> Please send your response to my sister Cora.  She is helping me with this because my head is not right because of my brain injury, her contact information is listed here for you.

Id.

19.     To facilitate MET's response, ODRA, included her home address and phone number, fax number, and work telephone number on the letter.  Id.

20.     MET's person most qualified ("PMQ") witness designee and the underlying claim litigation file handler, Tonya Johnson ("Johnson"), acknowledged that she read the Magnuson Letter to describe injuries that, if accurate, were serious and, generally speaking, would result in substantial medical bills.  Defs.' Ex. U at 59:14-60:24.[4]  Given the severity of MAGNUSON's injuries, MET supervisor Ilana Wolman also acknowledged the need to ascertain all other available excess insurance.  SUF No. 20; Defs. Ex. T at 101:15-102:21, 103:10-20.  Similarly, Defendants' expert, Tim Walker, interpreted MAGNUSON's injuries as severe enough that a reasonable carrier would have been very concerned that the value of the case would approach or even greatly exceed the

---

[4] It is stipulated that the Magnuson Letter did not contain any medical records or other verification of his stated injuries.  SUF No. 24.

7

1   $250,000.00 limits.  Trial Transcript ("TT") at 191:19-192:15, 198:21-199:13.  Even

2   Plaintiff's retained insurance expert, Edward Anderson, reluctantly agreed that the

3   injuries described in the Magnuson Letter (although undocumented) constituted

4   potentially very serious injuries.  TT at 147:17-148:12, 151:20-152:1.  Based on the

5   totality of the evidence in the record, it is clear to the Court that it would have been

6   obvious to a reasonable insurance professional that the value of MAGNUSON's claim

7   would exceed $250,000.[5]

8         21.    MET PMQ Johnson further testified that MET does everything reasonably

9   within its capabilities to settle a claim within the policy limits when it perceives that a

10  claimant is willing to settle short of litigation.  TT at 81:19-82:7.  In addition, MET claim

11  professional SCHILLER confirmed that, had she been in the position of MET's insureds,

12  she would want her own claims adjuster to seek clarification if the adjuster was confused

13  with regard to the meaning of communication like the Magnuson Letter.  SUF No. 85.

14  Indeed, Defendants' expert Walker testified that, where an insurance carrier believes a

15  claimant's request is ambiguous, insurance industry standards require that the carrier

16  work with the claimant to resolve that ambiguity.  TT at 193:8-12; 195:6-17.

17        22.    In this case, MET PMQ Johnson read the Magnuson Letter as expressing

18  an interest in settlement.  SUF No. 90.  MET claims supervisor, Wolman, testified

19  similarly that, per her training from MET and her understanding of MET's practices and

20  procedures, the language of the Magnuson Letter suggested that MAGNUSON was

21  willing to give MET whatever it needed and was willing to work with the claims adjusters

22  to resolve his case.  TT at 60:16-62:1; Defs.' Ex. T at 71:4-11.

23        23.    According to Defendants' expert Walker, a competent insurance

24  professional would objectively read the Magnuson Letter as an invitation to MET to enter

25  into settlement negotiations, assuming that MET revealed the limit amount as requested

26        [5] To the extent MET's witnesses attempted to avoid testifying to this conclusion, their credibility
       was significantly undermined.  Two hundred and fifty thousand dollars is a drop (although perhaps a
27     significant drop) in the bucket when it comes to evaluating a claim such as MAGNUSON's where he
       suffered injuries severe enough to require the level of medical care he obtained and where those injuries
28     naturally affected his ability to return to gainful employment.

1   by the claimant.  TT at 192:16-193:19.

2          24.     Moreover, MET claims supervisor Wolman interpreted the Magnuson

3   Letter as including a potential threat that if the 15-day time limit was ignored,

4   MAGNUSON intended to seek full compensation for all of his damages, regardless of

5   policy limits, from MET's insured, HEDLUND.  Defs.' Ex. T at 68:20-69:6.

6          25.     In fact, MET stipulated that it believed the aforementioned statement

7   reflected an accurate representation of MAGNUSON's intentions.  SUF No. 26.

8          26.     Wolman also confirmed that, based on the training she had received,

9   claims professionals must pay special attention to certain requests that come their way

10  when protecting the insured's interests.  SUF No. 82.

11         27.     Along the same lines, MET claims professional SCHILLER, indicated that

12  from the training and experience she had in bodily injury adjusting, a threat by a claimant

13  or an attorney to seek to obtain an excess judgment against an insured is one of the

14  most significant threats that a claims representative can receive.  SUF No. 83.

15         28.     For its part, MET has a written claim handling philosophy that describes

16  "timely" as follows:

17                 It is our philosophy to investigate claims in both a timely and
                   appropriate fashion.
18
                   **Timely**:  An investigation should be completed as soon as
19                 practicable.  While this term is almost impossible to define,
                   recognize the need to act promptly.  **If possible, all contact**
20                 **should be made within 48 hours.**  It is understood that
                   insureds, claimants, witnesses, and others are not always
21                 readily available.  In these circumstances, employ the tools
                   necessary to accomplish the task.
22

23  SUF No. 95 (emphasis added).

24         29.     That said, MET's adjustment policies and procedures do not specifically

25  address how its claims professionals are to handle time limits set by claimants or their

26  counsel regarding the provision of policy limits information.  TT at 82:8-14, 83:7-24.  In

27  fact, MET's retained expert Anderson testified that an insurance carrier is under no

28  obligation to respond to a claimant's request for policy limits information absent

1   verification of the claimant's injuries.  According to Anderson, because no verification of

2   MAGNUSON's injuries was provided, MET was not obligated to provide him with the

3   policy limits.  TT at 145:14-147:16, 158:9-22.

4         30.    Contrary to Anderson's opinion, 10 California Code of Regulation § 2695.5

5   provides that:

6              (b)  Upon  receiving  any  communication  from  a  claimant,
              regarding a claim, that reasonably suggests that a response
7              is expected, every licensee shall immediately, but in no event
              more  than  fifteen  (15)  calendar  days  after  receipt  of  that
8              communication,  furnish  the  claimant  with  a  **complete
              response  based  on  the  facts  as  then  known  by  the
9              licensee**.

10             .  .  .

11             e)  Upon  receiving  notice  of  claim,  every  insurer  shall
              immediately,  **but  in  no  event  more  than  fifteen  (15)
12             calendar  days  later**,  do  the  following  unless  the  notice  of
              claim received is a notice of legal action:
13
              .   .   .
14
              (2) **provide to the claimant necessary forms, instructions,
15             and reasonable assistance, including but not limited to,
              specifying the information the claimant must provide for
16             proof of claim**

17

18   10 Cal. Code Reg. § 2695.5 (emphasis added).

19         31.    In any event, against that backdrop, MET's only response to the Magnuson

20   Letter before he eventually retained counsel was nonetheless to send to MAGNUSON's

21   home a cursory form letter on October 15, 2016.  That form letter stated:

22             We are in receipt of your letter of representation. Because I
              will be handling this file, please direct all correspondence to
23             my attention.

24             In order for us to complete a thorough investigation we may
              need to obtain the following information for automobile claims
25             involving injury.

26             •   a signed medical authorization

27             •   copies of bills from all providers including diagnosis
                  and prognosis codes
28

10

- all medical treatment notes and charts

- a signed wage authorization (if you are claiming lost wages)

- a statement from the injured party(s)

***please note that with a signed medical authorization, we can obtain the bills and reports for you.

We have received your request for disclosure of our insured's policy limits. At this time, we are unable to disclose these limits due to California's Insurance Privacy Protection Act (Section 791.13). We have sent the disclosure form to our insured and are awaiting its return.

Once we are in receipt of the signed disclosure, we will comply with your request. Should you have any questions, please contact the undersigned.

Pl.'s Ex. 2.

32.     This form letter did not include authorizations for MAGNUSON to sign. SUF No. 32. It did not respond to MAGNUSON's inquiry with regard to MET's anticipation of the length of time that the claims submission process would take. Pl.'s Ex. 2. It did not request that MAGNUSON contact MET or request an extension of time to respond to MAGNUSON's demand for the limits information. Id.; SUF Nos. 31 and 38.

33.     MET's response was sent directly to MAGNUSON's home address and not to his sister, ODRA, who provided her contact information in the Magnuson Letter and who MAGNUSON requested be contacted because of his brain injury. Pl.'s Exs.1-2; SUF Nos. 29, 37, and 39.

34.     It is stipulated that the MET form letter was received by MAGNUSON sometime after October 15 and before October 30, as the date cannot be more precisely identified. SUF No. 30.

35.     MET did not attempt to contact MAGNUSON or ODRA by telephone, email, or any other means capable of more expediently reaching either of them, although it is undisputed that it would not have been impracticable for MET to contact MAGNUSON or ODRA during the 15 days set forth in the Magnuson Letter, even if only

11

1 | to request an extension of time.  SUF Nos. 40 and 41.

2 |       36.    On the other hand, between October 5, when the Magnuson Letter was

3 | received, and October 20, when the limits information was to be provided to

4 | MAGNUSON, not only did MET receive and review the CHP report and determine on

5 | October 11, 2012, that HEDLUND as 100% at fault for the accident, but its claims

6 | professionals also had <u>five</u> telephone conversations with its insureds.[6]  Despite the

7 | multiple telephone conversations, no MET employee apprised the insureds that MET

8 | had received the Magnuson Letter.  SUF Nos. 49-53.

9 |       37.    Moreover, on the following dates, managerial review of the claims file was

10 | triggered and undertaken:

11 |       October 6, 2012 (SUF No. 17)

12 |       October 13, 2012 (SUF No. 19)

13 |       October 16, 2012 (SUF No. 34)

14 |       October 19, 2012 (SUF No. 20)

15 | When flagged, the claims manager has access to the entirety of the file, which would

16 | include access to the Magnuson Letter.  <u>Id.</u> at 69:21-70:10, 125:3-10).

17 |       38.    Reviewing managers during this time frame did not direct any claims

18 | professional to advise MET's insureds of the content of the Magnuson Letter, or to

19 | contact the claimant for an extension of time to respond to the Magnuson Letter's

20 | demands.  SUF Nos. 38-39, 41, 46-47.  To the contrary, MET managers made no

21 | specific references to or directives related to the Magnuson Letter.  SUF Nos. 17, 19, 20

22 | and 34.

23 |       39.    Instead, ten (10) days after receiving the Magnuson Letter, on October 15,

24 | 2012, MET sent a form letter to its insured DANIEL SAH advising that a request for the

25 | policy limits information "may be received" from claimant SCOTT MAGNUSON.  That

26 | letter did not explain that such a request had in fact already been made and that the

27 |       [6] Notably, at the time MET reached this liability conclusion, there were still nine days remaining to

28 | respond to the MAGNUSON demand for the limits information, but MET nonetheless failed to do so.  Pl.'s
Exs. 1-2; SUF Nos. 29, 31, and 32; TT, p.187:14-188:1.

1    request included specific responsive time requirements.  SUF Nos. 42 and 43.

2        40.    MET's form letter to SAH stated that only:

3           A request to disclose your policy limits **may be received**
            regarding the events that occurred on September 21, 2012.
4

5           Disclosure of policy limits can only be made with your
            consent pursuant to California's Insurance Information and
6           Privacy Protection Act (Section 791.13).

7           Providing this information to the claimant, at this time, may
            avoid litigation and assist us with the proper resolution of this
8           case.

9           If you would like to proceed with disclosure of policy limits,
            please sign and date the attached form and return it to us in
10          the enclosed envelope as soon as possible.  Please note that
            no disclosure will take place unless the attached form is
11          returned.

12          If you have any questions, please call me.

13   Pl.'s Ex. 3 (emphasis added).

14       41.    That letter did not reference MAGNUSON's interest in settling his claim or

15   MAGNUSON's representation that if the 15-day time frame was ignored, he would

16   pursue the full value of his claim without regard to policy limits.  The letter did include a

17   "Disclosure of Policy Limits" signature page by which the insureds could agree to

18   disclose policy limits. Id.; SUF Nos. 42-46.

19       42.    Notably, after having indicated that the insureds "may" receive a policy

20   limits request from MAGNUSON, and despite already being in possession of such a

21   request, MET never provided its insureds with a copy of the Magnuson Letter.  SUF

22   No. 46; TT 101:13-17, 170:12-23.[7]

23   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
        [7] The Court is aware that MET objects to this fact to the extent it makes a finding as to MET's
24   conduct made during the underlying state litigation.  This fact is consistent with the record, however, and
     supports the Court's conclusion that MET acted in bad faith in handling the Magnuson Letter.  Accordingly,
25   that objection, and any other objections MET brings on this basis, are overruled.  MET's objections to the
     Court's inclusion of any stipulated facts is likewise overruled, and MET's objections to proposed facts not
26   included in the Court's final Order are overruled as moot.  The Court does note that MET has stipulated to
     a set of facts that includes conduct and correspondence up through March 2013.  It is unclear to the Court
27   why MET is willing to stipulate to facts from March 2013 as relevant, which is itself after the filing of the
     state action, but is not willing to stipulate to the relevance of facts through June 2013.  Moreover, in MET's
28   Proposed Findings of Fact, MET itself includes facts from June 2013, or facts it had previously argued
     were irrelevant.  ECF No. 48 at 11 (citing SUF No. 76).  MET cannot pick and choose to rely on only some
     facts from a particular time period it claims is irrelevant.

                                           13

1    43.    On October 19, 2012, MET sent an additional letter to both SUR and SAH

2    indicating this time that a request to disclose policy limits **had been** received from

3    claimant Renee Lowe.  That letter also included another "Disclosure of Policy Limits"

4    signature page, which, unlike the first disclosure sent to the insureds, contained

5    additional disclosure language under the line set forth for the insured's signature(s).

6    That new disclosure stated: "For your protection California law requires the following to

7    appear on this form.  Any person who knowingly presents a false or fraudulent claim for

8    the payment of a loss is guilty of a crime and may be subject to fines and confinement in

9    state prison."  Pl.'s Ex. 4.  During this pertinent time frame, it does not appear that any

10   letter was ever sent directly to HEDLUND.

11   44.    Eventually, on October 21, 2012, after having received no real response to

12   the inquiries in the Magnuson Letter, MAGNUSON retained counsel, Catia Saraiva, to

13   represent him.  SUF No. 56.  Two days later, MAGNUSON's counsel forwarded MET a

14   letter of representation.  SUF No. 57.

15   45.    On October 28, 2012, the insureds signed the "Disclosure of Policy Limits"

16   form that had been attached to the letter sent to the insureds with regard to claimant

17   Renee Lowe.  This is clear because the form the insureds signed contained the

18   disclosure language indicating that a policy limits demand "had" been received instead

19   of, as with respect to the MAGNUSON demand, that one "may" be received.  Pl.'s Ex. 5.

20   The Court infers from this fact that the insureds responded first to what had been

21   presented as an actual demand as opposed to the "hypothetical" demand from

22   MAGNUSON.

23   46.    On November 2, 2012, MET received the signed authorization from its

24   insureds to release the limits information.  SUF No. 55.  MET still did not release that

25   information to MAGNUSON, however, and, on November 6, 2012, 32 days after

26   MAGNUSON requested the limits information, attorney Saraiva wrote MET to advise that

27   because of its delay in releasing the limits information "to date," she considered the

28

14

1    policy limits to be "open" or uncapped.  Pl.'s Ex.6; SUF No. 61.

2          47.    In response to attorney Saraiva's letter, MET finally revealed that the policy

3    limits were $250,000.00 per injury.  MET also incorrectly advised attorney Saraiva that

4    MET had just received its insureds' consent to disclose on November 5, 2012, when that

5    consent had instead been in the claim file since November 2, 2012.  Pl.'s Ex.7; SUF No.

6    62.

7          48.    Defendants' claim handling expert Walker opined that, particularly

8    considering MET's determination of clear liability against its insureds and the multiple

9    opportunities it had to obtain consent from its insureds when it discussed various

10   unrelated aspects of the claim with them, the 15-day time limit set forth in the Magnuson

11   Letter was reasonable and not arbitrary under the circumstances.  TT at 188:2-189:21.

12         49.    MET claims professional SCHILLER also confirmed that, in order to settle

13   a serious injury case without litigation, a claimant will typically want to know the

14   insurance limits.  SUF No. 87.  According to SCHILLER, requests by claimants for policy

15   limits information are so common that MET has developed and uses a form letter that is

16   sent to its insureds prior to the presentation of any demand to settle by a claimant or

17   their lawyer, requesting that the insured provides advance written consent to disclose the

18   limits.  SUF No. 88.

19         50.    MET PMQ witness Johnson similarly testified that in cases involving severe

20   injuries such as MAGNUSON's, resolving a claim within the policy limits generally

21   requires revealing those policy limits to the claimant.  TT at 93:24-94:8.

22         51.    Defendants' expert Walker confirmed that it is not unusual to receive time

23   limits demands for various reasons other than just payment of a policy, and in serious

24   injury cases the revelation of the policy limits is a precursor to settlement.  Until those

25   limits are disclosed a settlement will generally not occur.  TT at 183:9-15, 196:12-20.

26         52.    MET's PMQ witness Johnson nonetheless testified that everything done in

27   conjunction with MAGNUSON's underlying claim conformed with MET's practices and

28   procedures.  SUF No. 94.  Additionally, as confirmed by testimony of MET claims

1  supervisor Wolman, no MET claims professional has ever been reprimanded or advised

2  that any aspect of the underlying claim was not done properly.  SUF No. 89; Defs.' Ex.T

3  at 10:21-11:17.  At trial, MET PMQ witness Johnson further averred that MET's practices

4  and procedures have not been modified or reformed to date. TT at 122:22-123:9.

5          53.      On the other hand, Defendants' expert, Walker, testified that pursuant to

6  industry standards the Magnuson Letter expressed MAGNUSON's interest in settlement

7  which would trigger MET's obligations to clarify any perceived ambiguities and to work

8  with MAGNUSON to settle the claim within the policy limits.  TT at 192:16-193:12.

9  Despite these industry standards, MET's PMQ witness, Johnson, testified that MET has

10  no specific policy regarding how to comply with policy limits information demands.  TT at

11  82:8-14, p.83:13-84:9.

12          54.      Walker further testified that if, for whatever reason, MET was unable to

13  respond within the 15-day time limit, it was obligated to request an extension of time to

14  respond to the Magnuson Letter, which it failed to do.  It was incumbent upon MET,

15  pursuant to industry standards, to protect its insureds and to comply with time limit

16  demands.  According to Walker, MET had to either comply with the time limit or to seek

17  an extension of time.  TT at 188:18-190:19.

18          55.      MET's retained expert Anderson disagreed and testified that he believes

19  MET "did a good job" in responding to the Magnuson Letter and properly handled the

20  claim within industry standards.  TT, p.134:1-16; 145:11-13.  According to Anderson, in

21  spite of handling "thousands" of claims over his career, he could not remember ever

22  seeing a request for policy limits information with a deadline.  TT at 128:20-129:7.

23  Anderson also testified that an insurance carrier is under no obligation to respond to a

24  claimant's request for policy limits information absent verification of the claimant's

25  injuries, and, because no verification of MAGNUSON's injuries was provided, he

26  believed MET was not obligated to provide MAGNUSON with the policy limits

27  information.  TT at 145:14-147:16, 158:9-22.  Walker testified in response that requiring

28  verification of a claimant's injuries before disclosing policy limits is not consistent with

16

1 industry standards and is a dangerous practice.  TT at 195:18-196:11.

2 56. Walker further testified that MET's October 15, 2012, letters to its insureds

3 and to MAGNUSON fell below industry standards.  The letter to MAGNUSON failed to

4 respond to his requests for policy limits or to include other requested information.  TT at

5 196:21-197:10.  The letter to MET's insureds failed to disclose that a demand from

6 MAGNUSON had been received, let alone a demand including a 15-day time limit.

7 Walker reasoned that MET failed to conform to industry regulations when it failed to

8 disclose to its insureds that a request for policy limits information had been made.  TT at

9 212:10-23.  From a practical perspective, even MET claims professional SCHILLER

10 admitted that she would have wanted to know the content of the Magnuson Letter, had

11 she been in the shoes of the insureds.  SUF No. 84.

12 57. On March 6, 2013, after litigation had been initiated, MET received a

13 settlement demand from MAGNUSON's counsel for $545,000.  SUF No. 71.  That same

14 day, MET forwarded a letter to HEDLUND and SAH informing them of the $545,000 offer

15 to settle and advising them both that MAGNUSON's counsel was looking to them to

16 satisfy any amount over their policy limits and that MET would not be responsible for any

17 excess over the policy limits.  SUF No.75; Ex.13.[8]

18 58. Defendants' claim handling expert Walker testified that MET should have

19 provided its insureds at the beginning of litigation with the factual basis upon which

20 claimant's counsel's "lid-off" theories were based, namely that MET had not acted in

21 good faith and that its own liability was thus allegedly not capped by the policy limits.  TT

22 at 200:10-201:7, 202:6-203:25.  He also opined that failing to properly advise the

23 insureds early on was misleading and likely delayed them from hiring personal

24 counsel.  TT at 201:8-202:5.  Defendants' expert further concluded that if personal

25 counsel was retained earlier on, the insureds would likely have been encouraged to

26 accept the statutory offer of $545,000.00.  TT at 207:5-208:7.

27 [8] The Court reiterates that it is aware of MET's objection to the relevance of post-litigation

28 evidence.  MET stipulated to the facts concerning the statutory offer, however, and MET offered the letter to its insureds into in evidence.  Accordingly, objection to this fact is overruled.

17

59.     Plaintiff's expert Anderson also acknowledged on cross-examination that MET's insureds would have benefitted if personal counsel was brought in at the time when the statutory offer of $545,000.00 could have been accepted, as opposed to later when the demand was $5,000,000.00.  TT at 168:19-169:12.

60.     In any event, a stipulated non-collusive Placer County Superior Court judgment was entered against the insureds on April 13, 2016, in the amount of $5,000,000.00, less applicable credits, with interest accruing at the legal rate of 10% per annum, until the judgment was fully satisfied.  SUF No. 96.

**CONCLUSIONS OF LAW**

1.     The parties appear to agree that for a California insurer to have breached the implied covenant of good faith and fair dealing, obligating it to pay extra contractual damages over and above the policy limits, an insurer's conduct in the adjustment and handling of a claim must be found to have been unreasonable under the circumstances. Aerojet-General Corp. v. Transport Indemnity Co., 17 Cal. 4th 38 (1997); PPG Industries, Inc. v. Transamerica Insurance Company, 20 Cal. 4th 310 (1999).

2.     To that end, MET contends that its response to the Magnuson Letter and its related conduct all amounted to reasonable, good faith efforts to adjust the claim on behalf of its insureds.  Conversely, Defendants contend that MET failed to take reasonable steps to comply with MAGNUSON's demands (e.g., failing to respond to his time sensitive limits request and/or failing to attempt to secure an extension of time to respond, if necessary) or inform its insureds of those demands.  According to Defendants, this pre-litigation bad faith handling forced into litigation a claim that should have resolved for the policy limits.

3.     The facts establish that the Magnuson Letter presented MET with an "opportunity to settle" as the letter clearly expressed an "interest in settlement" for an amount within the insureds' liability limits.  This communication obligated MET to make

18

1   reasonable efforts to respond to MAGNUSON's request and inform its insureds of

2   MAGNUSON's position.

3       4.      It is well established that "[w]hen a claimant offers to settle an excess claim

4   within policy limits, an opportunity to settle exists and a conflict of interest arises,

5   because a divergence exists between the insurer's interest in paying less than the policy

6   limits and the insured's interest in avoiding liability beyond the policy limit." Reid v.

7   Mercury Ins. Co., 220 Cal. App. 4th 262, 278 (2013).  Moreover, "a conflict may also

8   arise, without a formal settlement offer, when a claimant clearly conveys to the insurer

9   an interest in discussing settlement but the insurer ignores the opportunity to explore

10  settlement possibilities to the insured's detriment, or when an insurer has an arbitrary

11  rule or engages in other conduct that prevents settlement opportunities from arising." Id.

12  (citing Boicourt v. Amex Assurance Co., 78 Cal. App. 4th 1390, 1399 (2000)).

13      5.      "[T]he implied obligation of good faith and fair dealing requires the insurer

14  to settle in an appropriate case although the express terms of the policy do not impose

15  the duty; . . . in determining whether to settle the insurer must give the interests of the

16  insured at least as much consideration as it gives to its own interests." Crisci v. Security

17  Ins. Co., 66 Cal. 2d 425, 429 (1967).  "[I]t is common knowledge that one of the usual

18  methods by which an insured receives protection under a liability insurance policy is by

19  settlement of claims without litigation." Id.  "[A]n insurer negotiates in bad faith when it

20  refuses settlement offers that are both within policy limits and reasonable.  An offer of

21  settlement within policy limits is reasonable when there is a substantial likelihood that a

22  jury verdict will be beyond those limits." Highlands Ins. Co. v. Continental, 64 F.3d 514,

23  517 (9th Cir. 1995).

24      6.      An insurer's duty to effectuate settlement, however, is not limited to merely

25  the duty of accepting reasonable settlement offers. Travelers Indem. of Conn. v. Arch

26  Specialty Ins. Co., 2013 WL 6198966 (E.D. Cal.).  Rather, when settlement opportunities

27  are believed to exist, a carrier must play an active role in taking steps to effectuate

28  settlement on behalf of its insureds.  Id.

19

7.     Indeed, "California case law, and the California Insurance Code speak of a 'duty to effectuate settlement.'"  Id. at *8.  "It is not merely a duty to accept reasonable settlement offers."  Id.  "Effectuate means to put into force or operation."  Id. (quotation marks and citations omitted).  To that end, "[t]he Ninth Circuit has previously stated, applying California law, that the duty to effectuate is more than merely the duty to accept."  Id. at 9.  More specifically, "California courts would impose a duty on an insurer to 'attempt to settle a claim by making, and by accepting, reasonable settlement offers once liability has become reasonably clear.'"  Id. (quoting Pray v. Foremost Ins. Co., 767 F.2d 1329, 1330 (9th Cir. 1985)).  California Insurance Code Section 790.03(h)(5), "which identifies as an unfair claims settlement 'not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear,' has been construed as extending the duty to settle beyond mere acceptance of a reasonable demand."  Du v. Allstate Ins. Co., 697 F.3d 753, 757 (9th Cir. 2012).

8.     Indeed, in Gibbs v. State Farm Mut. Ins. Co., 544 F.2d 423 (9th Cir. 1976), the Ninth Circuit explicitly determined that under California law a written formal offer to settle is not necessary to trigger a carrier's obligation to attempt to reasonably effectuate settlement.  Id. at 427.  In Gibbs, the claimant had advised State Farm, without making a formal demand and without providing State Farm with any injury documentation, that his goal was to settle for the insurance money only, without having to file a lawsuit.  Despite learning of the claimant's intentions, "State Farm failed to conduct any negotiations with [him], neglecting its good faith duty to take affirmative action in settling the claim."  Id. The Court in Gibbs stated:  "[t]hough no formal, written offer existed, the jury could find that [the claimant's] statements gave State Farm a reasonable opportunity to settle the claim within the policy limits."  Id. (emphasis added).

9.     Based upon the Court's finding of facts as set forth above, the Court concludes that the Magnuson Letter expressed MAGNUSON's intention to work with MET, with the goal of ultimately settling his case for an amount within its insureds' limits, providing that MAGNUSON received the limits information within 15 days of MET's

20

1    receipt of his letter.  The Letter was thus sufficient under California law to trigger MET's

2    responsibilities to respond reasonably to effectuate a pre-litigation settlement.  Reid,

3    220 Cal. App. 4th 262; Travelers, 2013 WL 6198966; Gibbs, 544 F.2d 423 (9th Cir.

4    1976).  The Court further finds that MAGNUSON's communication obligated MET to

5    make a reasonable effort to work with MAGNUSON and to meet his timing demands.

6    Alternatively, if MET determined it was necessary, it was obligated at the very least to

7    have obtained an extension of time to respond, which it also failed to do.

8         10.    Because MET failed to take reasonable steps toward effectuating a pre-

9    litigation settlement for an amount within the policy limits as it was obligated to do once

10   MAGNUSON expressed his willingness to eventually settle his claim without litigation, it

11   breached its duties to its insureds.  Crisci, 66 Cal. 2d. 425; Reid, 220 Cal. App. 4th 262;

12   Travelers, 2013 WL 6198966; Gibbs, 544 F.2d 423.

13        **A.    The Magnuson Letter Was Reasonably Clear.**

14        11.    The Court rejects MET's suggestion that the Magnuson Letter was not a

15   reasonably clear communication in any material respect, and the testimony MET offered

16   to the contrary was less than credible.

17        12.    MAGNUSON's message was conveyed with reasonable clarity.  The

18   Magnuson Letter reflected MAGNUSON's intention to work with MET in resolving his

19   case for an amount within its policy limits.  The letter is also clear in warning that, absent

20   compliance, MAGNUSON would look to HEDLUND to recover excess damages.  SUF

21   Nos. 26 and 90; TT at 60:16-62:21; 192:16-193:19.

22        13.    Even if, assuming arguendo, some clarification of MAGNUSON's letter was

23   necessary, MET admits to doing nothing to attempt to resolve any perceived ambiguities,

24   which it had a good faith obligation to do.  See Betts v. Allstate Ins. Co., 154 Cal. App.

25   3d 688, 708 n.7 (1984).  MET's own claim professional SCHILLER confirmed that, had

26   she been in the insureds' position, she would want her own claims adjuster to seek

27   clarification if the adjuster was confused with regard to the meaning of the letter.  SUF

28   No. 85.  This obligation not only comports with common sense, but also with industry

1    standards requiring MET to seek clarification if it had any doubt about the meaning of the

2    Magnuson Letter.  TT at 195:6-17.  MET nonetheless never reached out to MAGNUSON

3    to indicate that any aspect of the Magnuson Letter was confusing or required

4    clarification.

5        **B.    Magnuson's Reasons For Needing The Policy Limits Were**
         **Understandable And Were Adequately Conveyed To MET.**

6

7           14.    MAGNUSON sent his letter to MET while he was still hospitalized.  SUF

8    Nos. 21 and 22.  He had just left his former employment and was scheduled to begin a

9    new job only days after his motor vehicle accident.  Defs.' Ex. HH at 28:7-14.  In light of

10   this, he was concerned both about his ability to pay for continued health insurance under

11   a COBRA coverage extension, as well as his ability to meet other necessary living

12   expenses.  Consequently, MAGNUSON was extremely anxious to know the amount of

13   the third-party insurance that would eventually be available to him for financial planning

14   purposes.  Id. at 28:15-29:7, 29:15-30:7, 35:7-36:8; Pl.'s Ex.1.  MAGNUSON conveyed

15   all of this to MET in his letter when he explained he had lost his insurance, could not

16   return to work, and did not know how he was going to be able to pay for his COBRA

17   benefits.  Pl.'s Ex. 1.  He also made clear that he needed to know whether he should

18   borrow money or try to change his living arrangements.  Id.

19          15.    MAGNUSON's financial situation created his reasonable need to know the

20   amount of the insurance as soon as possible, which should have been understandable

21   and taken seriously by MET as an important request by a claimant.

22       **C.    A Demand For Policy Limits Was Almost Inevitable Under The**
         **Circumstances.**

23

24          16.    By the time MET actually responded to MAGNUSON with its form letter, it

25   had already concluded that permissive user insured HEDLUND was 100% at fault for the

26   accident.  SUF No.18.  The Court heard testimony at trial that a reasonably prudent

27   carrier should have been aware of the need to take effective and prompt action to

28   protect the interests of its insureds where:  (1) an insured is liable for a serious injury

1   accident, as was confirmed by MET on October 11, 2012; (2) the insurer is aware that

2   the claimant is interested in attempting to resolve his case short of litigation for an

3   amount within the policy limits; and (3) there is a potential for excess judgment.  TT at

4   191:19-193:19, 198:21-199:13.

5          17.     Indeed, MET knew that disclosure of the policy limits would be a practical

6   precursor to being able to resolve a serious injury case like MAGNUSON's.  TT at 93:24-

7   94:8.  Therefore it was necessary for MET to have disclosed the limits information as

8   part of any serious attempt to settle the claims made against its insureds.  TT at 196:12-

9   20.  Given the relatively clear need to eventually disclose the policy limits and

10  MAGNUSON's clearly-articulated reasons for requiring expediency, it was unreasonable

11  for MET to proceed without haste.

12          **D.      Despite Internal And Industry Standards Requiring Complete And
                     Timely Responses To Claimant Communication, MET Failed To
13                   Appropriately Respond To MAGNUSON.**

14          18.     To that end, MET's own internal training directives impose an expectation

15  that its claims professionals will respond to an inquiry within 48 hours of its receipt.  SUF

16  No. 95.  In addition, California Code of Regulation section 2695.5 requires a carrier to,

17  "immediately, but in no event more than 15 calendar days later . . . provide to the

18  claimant necessary forms, instructions, and reasonable assistance including, but not

19  limited to, specifying the information the claimant must provide for proof of claim."

20          19.     Despite MET's own internal standards, statutorily imposed time limitations

21  for responding to inquiries, MET's own awareness that a disclosure of the limits

22  information was almost always required as a condition to settlement, and despite having

23  already determined its insured was 100% at fault for MAGNUSON's injuries, MET wholly

24  failed to act with any sense of urgency whatsoever in meeting MAGNUSON's conditions

25  for satisfying his claims against MET's insureds short of litigation.  MET's neglect in this

26  regard constituted a breach of the implied covenant of good faith and fair dealing under

27  the circumstances known to MET.

28  ///

1        20.    In fact, even though MET knew from the Magnuson Letter that he was still

2    hospitalized, and even though MAGNUSON requested that MET accommodate his brain

3    injury by contacting ODRA instead of him, MET's only response to MAGNUSON was to

4    wait ten (10) days before sending a materially non-responsive form letter to

5    MAGNUSON's last available home address.[9]  Although the letter from MET indicated

6    that MET had requested permission from its insureds to disclose policy limits, it did not

7    address any of the remainder of MAGNUSON's questions, and it entirely disregarded

8    MAGNUSON's request that MET contact ODRA under the circumstances.

9        21.    In addition, the letter from MET failed to include any of the necessary forms

10   or instructions, and, as the Court interprets section 2695.5, it did not provide

11   MAGNUSON with any "reasonable assistance" in achieving his goal of attaining the

12   policy limits information within 15 days of his letter.  This form letter did not advise

13   MAGNUSON that MET potentially needed more time to respond to his limits inquiry,

14   and/or that MET would encourage its insureds to reveal this information as requested by

15   MAGNUSON.  In short, MET did not provide MAGNUSON with any claim specific

16   responsive information.  It did nothing to encourage MAGNUSON to work with MET

17   which is an essential component to competent claims adjustment practices.  SUF

18   Nos. 29, 31, and 32; Ex.2; TT at 196:21-197:10.  In sum, MET's response was in no way

19   reasonably intended to actually reach MAGNUSON with any sort of expediency or to

20   further realistic settlement discussions.

21       22.    MET made no real attempt to meet MAGNUSON's timing demands or to

22   adequately respond to any of the inquiries in the Magnuson Letter.  TT at 187:14-188:1.

23   Accordingly, the Court thus finds that MET did not act, or even attempt to act, with any

24   sense of urgency in response to the MAGNUSON demand, as was required of a

25   reasonable insurance carrier whose goal was to protect the financial interests of its

26   insureds.  The Court finds that MET had every opportunity to meet claimant's 15-day

27                          

28        [9] The Court notes that Lowe had also advised MET through one of its employees that MAGNUSON was hospitalized and thus was not at home to receive mailed communications.

1   time limit, but failed to make any adequate effort to do so.  Consequently, MET violated

2   the duties owed to its insureds.

3         **E.**      **MET Also Failed To Sufficiently Communicate The Contents Of The**
    **Magnuson Letter To Its Insureds.**

4

5        23.    An insurance carrier has a duty to act reasonably under the circumstances.

6   This duty includes the obligation to fully advise its insureds of potentially significant risks,

7   which, in this context, would require MET to reveal the content of the Magnuson Letter.

8   See Boicourt, 78 Cal. App. 4th 1390.  Even MET claims professional SCHILLER

9   confirmed that she would have wanted to know the content of the Magnuson Letter had

10  she been in the shoes of the insureds.  SUF No. 84.

11       24.    Well established case law makes clear that a carrier must properly inform

12  insureds of material facts relevant to their defense, including settlement opportunities.

13  An insurer must advise an insured of any offer of settlement and of the company's

14  assessment of that offer.  Cain v. State Farm Mut. Auto. Ins. Co., 47 Cal. App. 3d 783,

15  791 (1975); see also Boicourt, 78 Cal. App. 4th at 1397 n.4.  Here, MET failed to provide

16  its insureds with critical information that could have led to a settlement within policy

17  limits.  Pl.'s Exs. 1, 3.

18       25.    Additionally, California Insurance Code Section 790.03(h) defines as an

19  unfair method of competition, or an unfair and deceptive act or practice in the business

20  of insurance to include:  (1) [m]isrepresenting to claimants pertinent facts or insurance

21  policy provisions relating to any coverages at issue.  "Claimants" is defined within this

22  regulation to include insureds.  10 Cal. Code Regs. § 2695.2.

23       26.    As above, despite knowing the potential seriousness of MAGNUSON's

24  injuries, appreciating that the value of MAGNUSON's claim might threaten the policy limit

25  and having already determined fault, MET's only attempt to communicate with its

26  insureds regarding the Magnuson Letter was to send them a misleading form letter.  Pl.'s

27  Ex. 3; TT at 212:10-23.  On October 15, 2012, MET sent a form letter addressed to SAH

28  indicating only that "[a] request to disclose your policy limits may be received."  Pl.'s

1   Ex. 3 (emphasis added).  Not only did MET not disclose that a request had already been

2   received, it wholly failed to advise its insureds that MAGNUSON had included a

3   responsive deadline or that the deadline was tied to MAGNUSON's willingness to settle

4   for policy limits.  The letter omitted any mention of MAGNUSON's intent to collect an

5   excess judgment from HEDLUND in the event of non-compliance.  Especially given

6   MET's acknowledgment that the threat of an excess judgment is one of the most serious

7   matters that a claims professional can ever encounter, MAGNUSON's warning that he

8   would pursue excess coverage from HEDLUND would have been critical information for

9   MET's insureds to have received.  SUF No. 83.  Under these circumstances, the Court

10  finds that MET's letter to its insureds was deceptive and likely created the impression

11  that no such limits disclosure demand had yet been made.

12          27.    This conclusion is supported by the fact that the insureds signed and

13  returned the disclosure form included in the letter MET sent to them regarding Renee

14  Lowe's request for policy limits.  Unlike the letter MET mailed with regard to the

15  MAGNUSON claim, MET's letter regarding Lowe's request for policy limits advised that a

16  request had already been made.  It thus presented the insureds with greater reason to

17  turn around a disclosure form than the first letter, which indicated only that a request

18  may be received from MAGNUSON.  The letter MET sent its insureds regarding

19  MAGNUSON conveyed no sense of urgency and would not have been interpreted by an

20  insured as requiring immediate attention.

21          28.    In contravention of state law, MET failed to inform its insureds that a time

22  limits demand for the limits information was pending.  Instead, it falsely stated only that a

23  demand for the limits information "may be received," which was a clear

24  misrepresentation of material facts to its insureds.  This misrepresentation related to the

25  coverage at issue (i.e., that HEDLUND may have personal exposure above the coverage

26  limits if the 15-day time frame for disclosure was ignored) and failed to reasonably inform

27  the insureds of the risks attendant to ignoring MAGNUSON's time sensitive demand for

28  the limits information, which in turn constituted a breach of the implied covenant of good

1  faith and fair dealing under the circumstances.  Aguiano v. Allstate Ins. Co., 209 F.3d

2  1167, 1169 (9th Cir. 2000); Boicourt, 78 Cal. App. 4th 1390.

3      **F.    MET's Use Of Form Letters Was Unreasonable Under The**
        **Circumstances.**
4

5      29.    The record is undisputed that MET did not use any expeditious (i.e.,

6  urgent) methods of responding to MAGNUSON or contacting its insureds to obtain their

7  consent to disclose the limits.  SUF Nos. 45 and 48.  MET did not try to place telephone

8  calls, send emails or faxes or do anything that would have helped expedite obtaining

9  the insureds' consent to disclosure or providing MAGNUSON the information he

10 requested.  SUF Nos. 45 and 48; TT at 163:16-164:4, 196:21-197:10.

11     30.    To the contrary, and quite incredibly, what the record does establish is that

12 MET claims professionals had five telephone conversations with its insureds during the

13 relevant 15-day time frame on a multitude of other topics (i.e., property damage, rental

14 car coverage, etc.) but never mentioned, when it had these obvious opportunities to do

15 so, anything about the Magnuson Letter.  SUF Nos. 49-53.  This failure serves to

16 demonstrate that MET obviously deemed the 15-day time frame as insignificant, despite

17 MAGNUSON's stated threat to pursue HEDLUND for any excess exposure absent a

18 timely response from MET to his disclosure request.

19     31.    There were also four managerial file reviews during this same time period

20 that were triggered by key words used to flag what may be potentially serious injury

21 claims.  SUF Nos. 17, 19, 20, and 34; TT at 123:20-124:7.  During these managerial

22 reviews, the claims manager had access to the entire claim file, including the Magnuson

23 Letter.  TT at 125:3-10.  Yet not once during these managerial reviews did a manager

24 ever reference the Magnuson Letter in any way, let alone direct anyone to expeditiously

25 respond to it.  SUF Nos. 17, 19, 20, and 34.

26     32.    The contacts described above also serve to show that MET was entirely

27 capable of reaching out to both its insureds and claimants by means other than form

28 letter.  Indeed, when MET wanted to reach someone, it proved able to do so.  Even MET

27

admits that it would not have been impractical for it to have acted urgently in responding

to the Magnuson Letter and that, if it had acted urgently, it has no reason to believe it

would not have received its insureds' timely consent to disclose the applicable limits.

SUF No. 48.

**G.    Even When MET Finally Received Its Insureds' Consent To Disclose The Policy Limits, It Unreasonably Failed To Provide That Information To MAGNUSON.**

33.    It is not lost on this Court that when MET did eventually receive

authorization to disclose policy limits from its insureds on November 2, 2012, MET still

continued to withhold this information from MAGNUSON.  SUF No. 55.  In fact, MET only

disclosed these limits after MAGNUSON was forced to retain counsel, Catia Saraiva,

who mailed and faxed a letter to MET on his behalf on November 6, 2012, indicating that

"since the insurance information was not provided, her view was that the lid was now off

the policy."  SUF No. 61; Ex. 6.  It wasn't until the following day, November 7, 2012, a full

33 days from the date it initially received the Magnuson Letter on October 5, 2012, that

MET claims professional SCHILLER disclosed the limits to MAGNUSON's attorney.

SUF No. 62; Ex. 7.  This additional delay, coupled with MET's complete failure to inform

its insured of the content or urgency of the Magnuson Letter, evidences MET's

indifference to MAGNUSON's timing demands.  In fact, it appears from the record that

the only reason MET disclosed the limits to MAGNUSON at all was because he retained

counsel to press the issue.

34.    Under the circumstances, the Court finds that the 15-day time limitation

imposed by the Magnuson Letter was reasonable and that, given the multitude of

opportunities available to MET to obtain its insureds' consent to disclosure in that time

frame, in conjunction with its complete lack of effort to have in any way attempted to

meet the time deadline or to obtain an extension of time to respond from MAGNUSON,

MET failed to reasonably protect the interests of its insureds.

///

35.     In light of MAGNUSON's known threat that if he did not receive the insurance limits information within the 15-day time frame, he would look to HEDLUND to pay any excess exposure, MET failed to act in good faith in its response to the Magnuson Letter.  The Court finds that MET's conduct in this regard fell well below the standard of care required of a competent California liability insurance carrier charged with the obligation of acting fairly and in good faith in the protection of the interests of its insureds.  See Reid, 220 Cal. App. 4th 262; Travelers, 2013 WL 6198966; Gibbs, 544 F.2d 423.

**H.     MET's Failures In This Case Were Apparently Sanctioned By MET.**

36.     The facts of this case do not involve an isolated error, something inadvertently falling between the cracks, or an oversight inconsistent with MET's established claim handling practices.  To the contrary, MET admitted that its handling of the MAGNUSON claim was undertaken consistently with its general practices and procedures and that MET has no specific policy or procedure for handling time sensitive demands for policy limits.

37.     MET also admitted that all aspects of the handling of the MAGNUSON claim were done consistently with its policies, practices and procedures.  SUF No. 94.

38.     No MET claims professional was in any way admonished for anything they did or failed to do, nor were any "suggestions" ever made to any involved claims professional that any aspect of the claim should have been handled differently.  SUF No. 89; Ex. T at 10:21-11:17.

39.     At trial, MET's PMQ witness Johnson testified that the manner in which the MAGNUSON claim was adjusted and how the insureds were treated was fully consistent with MET's practices and procedures and that, to date, none of those practices and procedures have been modified or reformed in any way.  TT at 122:22-123:9.

40.     In fact, MET admits that this claim was handled consistently with its practices and procedures and there is no dispute in this regard.  SUF Nos. 89 and 94.

41.     Although MET has compliance guidelines that compel immediate

1   responsiveness and full disclosure to its insureds when a time sensitive policy limits

2   demand to settle is made by a claimant or his/her counsel, MET has no time limits

3   response protocols in place when a claimant demands the limits information.  TT at 82:8-

4   14, 83:13-84:9.

5          42.     Similarly, although MET does not have a blanket policy of limits non-

6   disclosure, as did Amex Assurance in <u>Boicourt</u>, the Court here finds that MET's lack of a

7   policy to make best efforts to respond timely or to obtain an extension of time, if

8   necessary, similarly constitutes a violation of MET's obligation of good faith in the

9   protection of its insureds' interests.  <u>Boicourt</u>, 78 Cal. App. 4th at 1390; <u>Reid</u>, 220 Cal.

10  App. 4th at 272.

11          **I.      The Only Real Factual Disputes In This Case Arose From Differing
                     Expert Opinions.**
12

13         43.     In essence, the only testimonial disputes presented were between

14  Plaintiff's claim handling expert Anderson and Defendants' claim handling expert Walker.

15         44.     Walker testified, consistent with MET's PMQ and claim representative

16  testimony, that time limit demands from claimants or their counsel are commonplace and

17  disclosure of the limits is typically a prerequisite to settlement.   TT at 183:9-15, 196:12-

18  20.

19         45.     Anderson, on the other hand, indicated that MAGNUSON's demand was

20  essentially a demand of first impression.  TT at 128-20-129:7.  Anderson also testified

21  that in his opinion, until MET (or a carrier in general) has actual documentation in hand

22  (such as medical records or reports) confirming the severity of a claimant's injury that

23  would cause a carrier to believe that its policy limits are in jeopardy, it has no obligation

24  to provide a claimant with the limits information as requested by a claimant.  TT at

25  145:14-147:16, 158:9-22.

26         46.     Walker emphatically disagreed with the opinion that a carrier must wait to

27  have documentation of an injury or that a carrier can make a seriously injured claimant

28

1    wait as long as a half year before revealing to him the policy limits information.[10]  TT at

2    195:18-196:11.

3           47.     The Court finds that Walker offered the more credible testimony.  Not only

4    did Anderson's version of the facts fly in the face of case law, but it defied common

5    sense.  While a carrier might have to await documentation in order to actually finalize a

6    settlement, under the circumstances of this case there was no reason for a prudent

7    carrier not to easily assess the facts and determine that a policy limits disclosure was

8    prudent.  There was thus no need to await complete documentation in order to respond

9    to the Magnuson Letter.  In any event, MAGNUSON made completely clear that he was

10   willing to provide any documentation to MET that it might reasonably need.  MET

11   nonetheless failed to take any steps to timely and productively reach out to MAGNUSON

12   or its insureds to either be able to respond to MAGNUSON's request or to request an

13   extension of time.  By failing to make any real attempt to reach its insureds or

14   MAGNUSON as to MAGNUSON's claims, MET left everyone in the dark, breached its

15   implied duties to its insureds, and exposed itself to an excess judgment.

16          48.     Perfection or a guaranteed performance by the insurance carrier in every

17   circumstance in responding to time sensitive demands by claimants cannot be expected.

18   Yet a carrier must act reasonably promptly and with concern when receiving time

19   sensitive demands of any kind.  This is particularly true when the request, if ignored,

20   threatens the financial well-being of an insured in the event of non-compliance.  MET,

21   consistent with its lack of any sound policy in this regard, failed to adjust this claim prior

22   to litigation, in a good faith, fair and reasonable manner.

23   ///

24   ///

25   ///

26   ///

27   _____

28   [10] Plaintiff's expert Anderson acknowledged that it may take many months, even up to six months, with backlogged medical record requests for a claimant to obtain his/her records.  TT at 158:9-22.

1
2

### CONCLUSION

3        For the reasons set forth above, this Court finds that MET failed to properly

4    discharge the duties of good faith and fair dealing it owed to its insureds, and MET is

5    required to indemnify HEDLUND for the full amount of the stipulated Placer County

6    Superior Court judgment, without regard to its policy limits, in the amount of

7    $5,000,000.00, less offsets, including interest accruing at the legal rate from and after

8    April 13, 2016.  Judgment shall be entered in favor of Defendants, and the Clerk of the

9    Court is directed to close this case.

10       IT IS SO ORDERED.

11   Dated:  November 2, 2016

12

13   MORRISON C. ENGLAND, JR.
     UNITED STATES DISTRICT JUDGE

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

32